

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00085-CV

IN THE INTEREST OF J.G., D.G.,
AND C.G., CHILDREN

------------

## FROM THE 235TH DISTRICT COURT OF COOKE COUNTY

----------

## OPINION

----------

## I. Introduction

Appellants J.C. and C.C. appeal the trial court's denial of their petition to adopt three children, J.G., D.G., and C.G. Appellants contend in three issues that the trial court abused its discretion by denying their petition, by misapplying the best interest of the child standard, and by denying their appeal of the visiting

judge's order.  No appellee's brief was filed in this appeal.  We reverse and remand.

## II. Background

C.C. is the biological mother of the three children, but her parental rights to the children were terminated by court order in December 2007.  After C.C.'s parental rights were terminated, the children's great-grandparents were named as the children's permanent managing conservators.[1]  The final order of termination states that C.C. did not appear for trial either in person or through counsel.

Appellants were married on August 22, 2009.  They filed this suit for adoption of the three children on September 22, 2010.  At the time of filing, the children had lived with Appellants for more than two years.

Appellants both testified at the final hearing on November 23, 2011.  C.C. testified that she is married to J.C. and that she is the biological mother of J.G., D.G., and C.G.  At the time of the final hearing, J.G. was fourteen, C.G. was twelve, and D.G. was nine.  C.C. testified that the three children had lived with her and J.C. for at least six months before the commencement of the adoption suit and that the three children resided with her and J.C. at the time of the final hearing.

---

[1]We refer to the children's great-grandparents/permanent managing conservators individually as Grandmother or Grandfather and collectively as Grandparents.  *See generally* Tex. R. App. P. 9.8.

C.C. testified that her parental rights to the three children had been terminated by a court in 2007 and that drugs, specifically methamphetamines, were a problem for her at the time. The parental rights of the children's biological father had been terminated at the same time. C.C. testified, though, that her "whole life has changed," that she and J.C. now regularly participate in their church, that they teach and work with children, that she and J.C. had each been tested for drug use at the beginning of this case, and that the results were negative. C.C. testified that she was asking the court to grant an adoption of all three children by Appellants and that adoption would be in the children's best interest.[2]

At the end of C.C.'s testimony, the trial court asked C.C. who had initiated the suit to terminate her parental rights, and C.C. testified that she believed it to be CPS. C.C., however, denied having received any court papers related to the termination case, testifying that her grandparents had contacted her to say that her rights had been terminated. But in response to another of the trial court's questions, C.C. also said that she had received a service plan for the CPS case. When the trial court asked why CPS had gotten involved in her life, C.C. testified that she had been using drugs.

J.C. then testified and basically reiterated C.C.'s testimony, including that he believed adoption was in the children's best interest. At the conclusion of

---

[2]C.C. also testified that she was asking the court to change the children's last names.

3

J.C.'s testimony, the trial court expressed its opinion that C.C. had not been as forthcoming with her testimony about the CPS case as the court had hoped she would be and asked counsel to provide the court with the paperwork from the termination case. Among other things, the trial court stated that "using drugs isn't what it takes to get CPS in your life. Using drugs and a problem with your children is what gets CPS in your life." The trial court later stated that it was "going to know what went on with the children beforehand before I let this lady who gave them up adopt them."[3]

Several other documents were in the trial court's file at the time of the final hearing and are included in the clerk's record in this appeal. Among them are waivers of citation and consents to adoption filed by Grandmother and Grandfather, who were still serving as the children's permanent managing conservators. In those documents, Grandmother and Grandfather each expressly consented to the children's adoption by Appellants.

Also within the court's file was a report prepared by Sandy Russell, the person the trial court had appointed as "evaluator to make and prepare a preadoptive social study and postplacement adoptive social study to evaluate the parties." Russell filed her report with the trial court in January 2011, almost ten months before the final hearing.

---

[3]The documents relating to the 2007 termination case are not included within the appellate record.

Russell's report states that Grandmother "started letting the children see their mother once [Grandmother] saw that [C.C.] was changing her life," that Appellants lived next door to Grandparents, and that the children had resided with Appellants since July 2008. Russell also reported that "[a]ll three children are in excellent health and [that] their immunizations are current." Russell wrote that C.C. does not work outside the home and that she is at home when the children return from school each day. C.C. is also "very active in the church" and "teaches a children's class." Russell also reported that "[a]ll of the children stated they want this adoption very much."

Russell's report also includes a favorable description of J.C. as well as Appellants' home environment. Among other things, Russell reported that

> [J.C.] and [C.C.] provide a good family unit for their family. The family is active in their church, the children's athletic events[,] and watching movies together. [C.C.] considers herself to be a loving parent and states that the children are the most important people in her life. Both parents stated that the children are very well behaved and usually react well to verbal punishment and that they usually use the grounding method. The children were interviewed separately and all stated that they very much want the adoption. They love being with their mom and stated [J.C.] is [a] good dad.

> . . . .

> [The children] are healthy children who are glad to be reunited with their mom and are lucky that [Grandmother] was able to keep the family together and is still in their daily lives. [J.C.] loves them and they appear to return his affections. [J.C.] and [C.C.] are aware of how fast life can change and want to protect their family emotionally as well as financially.

> . . . .

5

[Grandmother] was interviewed by phone on January 7, 2011. [She] states that she feels that [C.C.] has turned her life around[,] and she sees how happy the children are on a daily basis. They love their mom and [J.C.] very much. She stated when the children were separated from their mom that they cried for her often. [Grandmother] stated that she made the decision to let the children live with their mom when she straighten[ed] her life up and became a responsible parent again.

All references responded favorably and stated [J.C.] and [C.C.] are good parents. They are active with their children in church and school activities.

. . . .

All three children are very healthy children who already consider [J.C.] and [C.C.] as their parents. [J.C.]'s family is committed to [the children] and has stated that this will remain unchanged whether the adoption is approved or unapproved. Adoption is recommended.

Attached to Russell's report are responses to questionnaires that Russell had sent to Appellants' four references and a letter of recommendation from Appellants' pastor. The letter of recommendation and each of the questionnaire responses contain very favorable descriptions of Appellants as parents.

On April 2, 2012, the trial court signed an order denying Appellants' petition for adoption. The trial court's findings of fact and conclusions of law are dated June 6, 2012. The trial court's findings of fact state that C.C.'s parental rights to the children were terminated on December 14, 2007, following a suit initiated by CPS; that Grandparents had been appointed as the children's permanent managing conservators; that Grandparents had permitted the children to live with Appellants after December 14, 2007; and that Appellants had filed a

6

petition for adoption of the children on September 22, 2010. The trial court's sole conclusion of law was that adoption of the children by Appellants "is not in the best interest of the children."

## III. Discussion

In their first and second issues, Appellants contend that the trial court abused its discretion by denying their petition for adoption and by misapplying the best interest of the child standard.

## A. Applicable Law

Family code section 162.016(b) states that "[i]f the court finds that the requirements for adoption have been met and the adoption is in the best interest of the child, the court shall grant the adoption." Tex. Fam. Code Ann. § 162.016(b) (West 2008). The decision to grant or deny an adoption is within the discretion of the trial court, and we may not set aside the decision except for abuse of discretion. *See In re W.E.R.*, 669 S.W.2d 716, 716 (Tex. 1984); *In re D.R.L.M.*, 84 S.W.3d 281, 305 (Tex. App.—Fort Worth 2002, pet. denied). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). Legal and factual sufficiency are not independent grounds of error in this adoption context, but they are relevant factors in deciding whether the trial court abused its discretion. *See D.R.L.M.*, 84 S.W.3d at 301. For this

analysis, we consider whether the court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion. *See Newell v. Newell*, 349 S.W.3d 717, 720–21 (Tex. App.—Fort Worth 2011, no pet.).

**B. Analysis**

We begin by determining whether the trial court had sufficient information upon which to exercise its discretion, and we hold that it did. In addition to Appellants' testimony, the trial court had each Grandparent's waiver of citation and consent to adoption, Russell's report, and the attachments to Russell's report, all of which expressed support for Appellants' petition to adopt the children. This information was sufficient for the trial court to properly exercise its discretion.

We next address whether the trial court erred in the application of its discretion. Although the trial court did not base its denial of the petition for adoption on a failure to establish the prerequisites to adoption and concluded only that the adoption would not be in the children's best interest, we note that it appears that the prerequisites to adoption have been established. Family code section 162.009 states that a child must reside with the petitioner for at least six months before a court may grant an adoption unless the court determines that waiver of the requirement would be in the child's best interest. Tex. Fam. Code Ann. § 162.009 (West 2008). Both C.C. and J.C. testified that the children had lived with them for more than six months. Family code section 162.010 requires

8

the consent of a child's managing conservator if the managing conservator is not the petitioner, and each of the children's managing conservators filed their consent to the adoption by Appellants. *See id.* § 162.010 (West 2008). There is also a pre-adoptive and post-placement social study by Russell on file with the trial court as required by family code section 162.003. *See id.* § 162.003 (West 2008); *see also id.* §§ 162.005, .007 (West 2008).

Turning now to the trial court's conclusion that adoption by Appellants would not be in the children's best interest, we note that the circumstances of this case are quite similar to those in *In re D.D.T.*, No. 11-04-00022-CV, 2005 WL 283579, at *1–2 (Tex. App.—Eastland Jan. 31, 2005, no pet.) (mem. op.). In *D.D.T.*, Jones, a single woman with four other children, sought to adopt two boys. *Id.* at *1. The boys had lived with Jones and her other children for twenty months, and the record included a home study, a social study, a criminal background check, and similar items. *Id.* Jones testified in support of her petition to adopt the boys, and the trial court also asked to hear testimony by CPS adoption specialist Sherilyn Money. *Id.* Money testified that she was familiar with Jones and the case file, and she recommended that the trial court grant the adoption by Jones. *Id.*

The *D.D.T.* court summarized the next part of the adoption hearing as follows:

> The trial court then questioned Money about the availability of couples who wanted to adopt children and the details surrounding that situation. The trial judge commented on the record that it was

his impression that there were "just lots and lots and lots of couples waiting to adopt children," and that he was personally acquainted with couples who had paid as much as $25,000 or $30,000 to "adopt a Russian child or Chinese child." The trial judge told Money that he was not "arguing with [her] assessment that Jones is an appropriate placement." However, the trial judge "wonder[ed] why these children cannot be placed in the home [of] a couple who are able to meet the financial needs of these children." Money then told the trial court that the children were hard to place children and that they had become "attached by the time the termination was done. And it would be very difficult to move them out of this home."

*Id.* After initially stating that it would grant the adoption, the trial court changed course and announced that the adoption would be denied. *Id.* at *1–2.

Addressing Jones's sole issue on appeal—that the trial court erred by denying the petition for adoption "because all of the evidence was uncontroverted and supported the adoption"—the *D.D.T.* court held that the trial court abused its discretion by denying the petition for adoption. *Id.* at *3. In so holding, the court wrote,

> Nothing in the 13-page clerk's record or in the 11-page reporter's record in this case supports the trial court's decision. All of the evidence of record in the case was in support of Jones's petition for adoption of DDT and BDT. The implied findings of fact are not supported by any evidence of substantive and probative character. Even if there were some evidence to support the implied findings, the implied findings are against the great weight and preponderance of the evidence, as outlined above; and the trial court abused its discretion when it denied the petition for adoption.

*Id.*

Here, the Grandparents, who are also the children's permanent managing conservators, supported the adoption; the court-appointed evaluator recommended adoption; all of Appellants' references supported their petition for

10

adoption; and the children's attorney ad litem supported the petition for adoption. The trial court seemed to believe that C.C. was not entirely truthful in responding to questions about the prior parental termination case, stating that C.C. must have been served with the suit before her parental rights had been terminated and questioning C.C. about her past drug use. It is possible, however, that C.C. did not understand the trial court's question about service of process or that the trial court misinterpreted C.C.'s answer. C.C. testified that she "wasn't present whenever [her] rights were terminated" and that her grandparents contacted her to tell her that her rights had been terminated. But C.C. also testified that she received "court papers" and that the papers told her "that [she] needed to take some classes and different things that were ordered from CPS." It thus appears that C.C. received at least a service plan in the termination case.

We as an appellate court are not free to judge the credibility of the witness or to substitute our judgment for that of the trial court, and we do not purport to do so by pointing out the possible misunderstanding of C.C.'s testimony. *See Owen v. Jim Allee Imports, Inc.*, 380 S.W.3d 276, 290 (Tex. App.—Dallas 2012, no pet.) ("Under an abuse of discretion standard, the trial court judges the credibility of the witnesses and may resolve any conflicting testimony."). However, whether C.C. misunderstood the trial court's question or whether the trial court misinterpreted C.C.'s answer about being served in the parental termination case, that series of questions and answers is the only evidence that weighs in favor of denying Appellants' petition for adoption. Otherwise, C.C.

11

acknowledged that her prior drug use led to the termination of her parental rights, but she also testified that she had turned her life around and no longer uses drugs. All of the other information and evidence before the trial court overwhelmingly weighed in favor of granting the petition for adoption. No one opposed adoption, and the children each expressed a strong desire to be adopted by Appellants. We therefore hold that the trial court abused its discretion by concluding that adoption is not in the children's best interest because the evidence supporting the trial court's finding is against the great weight and preponderance of the credible evidence contrary to the finding. *See D.D.T.*, 2005 WL 283579, at \*3 (holding trial court's implied findings in adoption case against great weight and preponderance of the evidence). Thus, although the trial court had sufficient evidence before it upon which to exercise its discretion, the trial court erred in the application of its discretion. *See id.*; *see generally Newell*, 349 S.W.3d at 720–21 ("In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion."). We therefore sustain Appellants' first and second issues and do not reach their third issue.[4] *See* Tex. R. App. P. 47.1.

---

[4]Appellants' third issue would not entitle them to any additional relief from this court even if we sustained it.

12

We cannot, however, render judgment for Appellants because they had the burden of proof in this adoption proceeding, and we cannot hold that they proved as a matter of law that adoption is in the children's best interest. The series of questions by the trial court and answers by C.C. is some evidence, albeit factually insufficient evidence, that adoption is not in the children's best interest. *See D.D.T.*, 2005 WL 283579, at *3 (remanding for new trial because petitioner seeking adoption bore burden of proof but did not conclusively prove elements necessary to adopt). We therefore remand the case to the trial court for a new trial.

## IV. Conclusion

Having sustained Appellants' first and second issues and having not reached their third issue, we reverse the trial court's judgment and remand the matter for a new trial on Appellants' petition for adoption.

ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., filed a dissenting opinion.

DELIVERED: September 12, 2013

13