

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-16-00124-CV

**IN THE INTEREST OF M.J.P.**

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-00878
Honorable Karen Crouch, Judge Presiding

Opinion by:  Karen Angelini, Justice

Sitting:  Karen Angelini, Justice
Marialyn Barnard, Justice
Jason Pulliam, Justice

Delivered and Filed:  December 14, 2016

AFFIRMED AS MODIFIED

This appeal arises from a contested adoption proceeding. At the time of the bench trial in February 2016, M.J.P., a four-year-old girl, was eligible for adoption because the parental rights of her biological parents had been terminated. At the time of the termination, M.J.P. had been placed in the home of her great-uncle, Javier S., and his wife, Cristina B. The permanency plan was for Javier S. and Cristina B. to adopt M.J.P. However, before their petition was granted, Javier S. initiated divorce proceedings. When the Department of Family and Protective Services learned that Javier S. had filed for divorce, it decided to place M.J.P. with Javier S. At that point, M.J.P. had lived with both Javier S. and Cristina B. for eighteen months and referred to Javier S. as "Daddy" and Cristina B. as "Mommy." Javier S. and Cristina B. then proceeded with separate petitions to adopt M.J.P. After a bench trial, the trial court granted Cristina B.'s petition to adopt

M.J.P. and denied Javier S.'s petition. The attorney and guardian ad litem for M.J.P., Carla Morrison, then filed a notice of appeal on behalf of M.J.P.

## BACKGROUND

At trial, ten witnesses testified. The first witness called was Marisa Bono, who had been friends with both Cristina B. and Javier S. for six years. Bono testified that her four-year-old son attended the same daycare as M.J.P. and that she had spent a lot of time with M.J.P. and Cristina B. because the children were playmates. According to Bono, she first met M.J.P. in May or April 2014 and learned from Cristina B. that M.J.P. had been removed from her biological parents. Bono testified that Cristina B. advocated M.J.P. living with her and Javier S. because she did not want M.J.P. to be placed in foster care. Bono testified that Cristina B. felt like "she was being called" to help M.J.P., but was conflicted because Javier S. had been reluctant to bring M.J.P. into their home. According to Bono, Javier S. had told Cristina he was not interested in having children because he had already raised his nephew. Bono testified that Cristina B. was worried about creating conflict in her marriage but was nonetheless "compelled" to bring the child into their home.

Bono testified that when she first met M.J.P., M.J.P. was "very sweet," but "seemed shy, a little tentative, and a little withdrawn." Bono testified that after living with Cristina B. and Javier S. for months, Bono saw a complete change in M.J.P.'s personality. M.J.P. became very outgoing, and was exuberant and happy. Bono testified that M.J.P. is an "exceptionally intelligent little girl and also very mature for her age." According to Bono, M.J.P. became the one who was engaging her son and "trying to pull him all over the place and bossing him around." "[H]er personality really started coming through." "She was more articulate. She was more outgoing. She was more social. She was more confident. It was like night and day." Bono could only attribute the change to "her placement in a stable, loving home."

Bono admitted that she did not have much opportunity to observe M.J.P. with Javier S.; however, Bono testified that it was clear M.J.P. "was being nurtured by her mother." Bono testified that Cristina B. and M.J.P. bonded, and M.J.P. called Cristina B. "Mommy." When asked whether Cristina B.'s career prevented her from engaging in parenting, Bono disagreed with the assertion that Cristina B. had no time for M.J.P. because of her career. Bono testified that from her observations, Cristina B. is "an excellent mother."

Bono further testified that Cristina B. wants Javier S. in M.J.P.'s life. Cristina B. intends to maintain M.J.P.'s relationship with Javier S. and create a visitation schedule. In contrast, Bono testified that Javier S. has kept Cristina B. from M.J.P., which made Bono question Javier S.'s ability to provide for M.J.P. emotionally. Bono testified that Javier S. wants to sever all connection between Cristina B. and M.J.P., which indicates Javier S. places his needs above M.J.P.'s needs. Bono emphasized that parents have to make difficult decisions and place their child's needs before their own.

Phyllis Viagran, a civilian caseworker with the San Antonio Police Department's crisis response team, was the second witness to testify. Viagran testified that her job is to follow up on family-violence cases. She testified as a friend of Cristina B. and explained that she was there in 2014 when M.J.P. was placed with Cristina B. and Javier S. At that time, M.J.P.'s biological mother had a drug problem, and M.J.P.'s biological father was in jail for a significant period of time. Javier S. and Cristina B. were considered for placement because Javier S. was a blood relative of M.J.P. Viagran testified that at first, M.J.P. was a very shy child, but that after living with Cristina B. and Javier S. for a few months, M.J.P. seemed like a "normal" kid. According to Viagran, in December 2015, Javier S. wanted a divorce from Cristina B. Viagran testified that Cristina B. told her Javier S. had left the marital bed and started sleeping with M.J.P. in her room. Viagran testified that when Javier S. and Cristina B. first became a couple, Javier S. did not want

to have children. After he and Cristina B. took M.J.P. as an emergency placement, he told Cristina B. that he did want children. Then, in December 2015, Javier S. told Cristina B. that he wanted a divorce. Viagran testified that she was concerned Javier S. cannot maintain a healthy relationship with an adult female. She criticized Javier S. for using the women in his life. According to Viagran, Javier S. uses his mother to clean his home, he uses his sister to make meals, and he used Cristina B. to pay for his education and help him find his job.

Viagran also criticized the Department for how it handled this case. She noted that the Department did not conduct a home study before M.J.P. was placed with Cristina B. and Javier S. Viagran testified that the Department's choice to allow Javier S. to adopt M.J.P. was inappropriate because the decision was "rushed into initially." Viagran explained that because Cristina B. is not related by blood to M.J.P., Cristina B. will be more protective of M.J.P. According to Vaigran, Cristina B. is not going to give M.J.P. back to family members who should not be around M.J.P. Viagran testified that she fears Javier S. is going to allow certain family members access to M.J.P. Viagran based this fear on her observations at M.J.P.'s birthday party where M.J.P.'s "grandmother and great-grandmother . . . had the run of [the party]." Viagran noted that M.J.P. "removed herself from the party for a while and just played with her friend because [her friend] was the only [child] there." Viagran testified that she felt "like that was indicative of what's going to happen if [Javier S. is] given custody of [M.J.P.]. [M.J.P. is] going to be handed back over to them." Viagran testified that Javier S.'s mother and sister are a "crutch" and that Javier S. is "dependent on them." Viagran did not believe Javier S. could raise M.J.P. without them.

Cristina B.'s mother, Maria B., was the third witness to testify. Maria B. testified that she saw Cristina B. and Javier S. take care of M.J.P. from June 2014 until November 2015. She explained that when Cristina B. went out of town, she would go over to help take care of M.J.P. She testified that Javier S. asked her to sleep in the master bedroom so that he could sleep in

M.J.P.'s room. She testified that Javier S. always slept in the same bed as M.J.P. Maria B. testified that Cristina B. and Javier S. were co-parents and shared parenting responsibilities. According to Maria B., Cristina B. told her to use the time-out technique to discipline M.J.P.

Maria B. testified that Cristina B. had always wanted children, but Javier S. had not wanted to start a family. Maria B. told Javier S. not to take M.J.P. into the home if he was not going to stay married to Cristina B. Maria B. criticized Javier S. for taking M.J.P. into his home with Cristina B. when he had already been contemplating getting a divorce: "But [Javier S.] did wrong because he was already thinking about getting divorced; and even like that, he took the child in. And, -- and so he was – he was lying to us because he was already thinking about divorce. He was already – he already had a girlfriend; and even like that, he wanted to take the child in."

Cristina Medrano, the director of the Mustard Seed Academy where M.J.P. attended preschool, was the fourth witness to testify. Medrano testified that M.J.P. was always well groomed, and a very clean, happy child. Medrano testified that M.J.P. was on target developmentally. Medrano testified that M.J.P. started having potty-training accidents when the couple began divorce proceedings and Cristina B. was only allowed to visit M.J.P. at the school. According to Medrano, she told Javier S. that M.J.P. needed to visit with Cristina B. in a more private place, like her home. Medrano testified that she believed M.J.P. started having "accidents" because she did not know what was happening or when she would see Cristina B. again. Medrano explained that the visits had been under the control of the Department. Medrano felt that the preschool was not an appropriate place for the visitation to take place. She explained that the school had a lot of children and that M.J.P. "wasn't having her one-on-one [time with Cristina B.]; and after that, [Cristina B.] would leave [and] M.J.P. would stay upset." According to Medrano, she told Javier S. that M.J.P. needed both of them.

Dr. Mary Ponce, a clinical psychologist, was the fifth person to testify. She had seen M.J.P. for six weeks, consisting of three fifty-minute appointments in January 2016 and one in February 2016. She had only seen M.J.P. with Javier S. and had never met Cristina B. Dr. Ponce explained that during the appointments, they did "expressive modalities . . . or some play." Dr. Ponce concluded based on the results of the psychological evaluation that M.J.P. had minimal issues. Dr. Ponce testified that M.J.P. was well bonded to Javier and called him "Daddy." Dr. Ponce had not noticed any "red flags" raised about the relationship. Dr. Ponce noted that M.J.P. told her she had visits with Cristina B. at the daycare. Dr. Ponce testified that when she asked M.J.P. to draw her family, she drew a picture of herself and Javier S. M.J.P. then drew her brothers and sisters in another picture, which Dr. Ponce believed were her classmates at her daycare. Dr. Ponce concluded the most prominent parent figure for M.J.P. is Javier S.

Dr. Ponce explained that the Department had asked her to conduct some sessions with M.J.P. and Cristina B. but that she decided not to do so because she felt that she "had already established the – the framework for – for the counselling given that [Javier S.] was the primary caregiver, and he was bringing M.J.P. consistently." Dr. Ponce stated that the initial referral was for M.J.P. and the caregiver, which was Javier S. According to Dr. Ponce, if the referral had stated both parents, then she would have also conducted sessions with Cristina B. Dr. Ponce believed that if Javier S. was not allowed to adopt M.J.P., M.J.P. would regress in her development because she had identified Javier S. as the primary parent and her caregiver.

On cross-examination, Dr. Ponce admitted that she had not been aware of the fact that M.J.P. had lived with Javier S. and Cristina B. from May 2014 through Nov. 2015. Dr. Ponce testified that she thought M.J.P. had only lived with Cristina B. for a few months. She admitted that if she had known M.J.P. had lived with Cristina B. for eighteen months, she might have approached this case differently. She might have been concerned about separation anxiety or

attachment issues. Dr. Ponce testified that she had been given specific guidelines tailored to this case, including M.J.P.'s adjustment, her developmental progress, at home and at school, and her attachment. Dr. Ponce testified that she did not contact Cristina B. because she did not believe Cristina B. had lived with M.J.P. for a significant period of time.

When asked what her recommendation was with respect to M.J.P.'s best interest in a contested adoption between Javier and Cristina, Dr. Ponce admitted that she had not had "the opportunity to assess each individual as a parent and the stability of their character, their capacity to parent, so [she could not] render an opinion." She admitted that from her limited sessions, she was not able to identify and assess the "protective capacities" of Javier S. and Cristina B. She could not assess which parent could best provide for M.J.P.'s educational needs. She could not assess which parent could provide for M.J.P.'s psychological and emotional needs. She could not assess which parent was better equipped to provide for M.J.P.'s physical and safety needs. She did not assess whether Javier S. or Cristina B. had sufficient resources to provide for M.J.P.'s needs. She was not able to assess whether Javier S. or Cristina B. provided more stability to M.J.P.

The seventh witness to testify was Jennifer Velasquez, an evaluator with the Department, who performed the home studies on Cristina B. and Javier S., respectively. Velasquez testified that Cristina B. was "very bonded to the child." Cristina B. "had a lot of positive affirmation and love for the child, who was already bonded." Velasquez noted that Cristina B. felt she had not been given a fair chance with the caseworker. Further, she felt she was not being allowed to participate in a lot of the meetings involving M.J.P. and was never given an answer by the Department as to why. When asked if she thought Cristina B.'s feelings had merit, Velasquez replied, "Yes." Velasquez agreed that the Department did not really give Cristina B. any justification.

Velasquez was asked whether Javier S. told her that "his family resources are the same family that this child was removed from for not being protective of her." Velaquez replied, "Yes,"

and noted that it did impact her assessment. Velasquez testified that Javier S. had acknowledged that fact and said he would not allow M.J.P. to be with her biological parents. Velasquez testified that she believed Javier S. would be protective of M.J.P.

When asked if there was anything about Cristina B. that concerned her, Velasquez replied, "No, she seems – appeared very family-oriented, very involved with her siblings and both parents." Velasquez noted that Cristina B. was very family oriented even though her parents live in a different city. Velasquez explained that Cristina B. "had a lot of social support, and her job was very flexible." Velasquez testified that she found Cristina B.'s discipline appropriate – "there were no issues with the discipline." Velasquez noted that Cristina B. "was receptive to having shared visits" with Javier S. Accoding to Velasquez, M.J.P. said that she lived with both "her mom and dad." Further, Cristina B.'s references were all positive, and they all spoke highly of Cristina B. professionally and personally. Velasquez testified that Cristina B. "has long, stable friendships." According to Velaquez, Cristina B.'s home "would be a positive placement" for M.J.P.

Velasquez testified that Javier S. did disclose he was diabetic. Velasquez was concerned about his smoking tobacco because M.J.P. is asthmatic. Velasquez was aware that Cristina B. did not want a divorce and that she was willing to work things out with Javier S. so that M.J.P. could be raised by both parents. Velasquez also testified that she had concerns about Javier S.'s ability to provide for M.J.P. financially and that he would benefit from financial assistance. Velasquez testified that if she were to award grades for the home studies, she would award Cristina B. an "A" and Javier S. a "B."

Cristina B. was the eighth witness to testify. Cristina B. explained that she had "been advocating for [M.J.P.] since she was a month old." When M.J.P. was a month old, she and her biological parents had been at Cristina B. and Javier S.'s home for Christmas. Cristina B. explained that both biological parents "were on drugs at that time." Cristina B. testified,

That's when I first met her, and I knew that she needed somebody to be an advocate for her. As the years progressed, we saw [M.J.P.] during holidays and birthday parties, and at this time, it was my sister-in-law [who] would have her and drop her off at my in-laws' [home] . . . And when [Javier] called [me] and said can we go to a mediation for my sister, I said yes. I left work, and I met them. We were supposed to go around the table and say something on behalf of [M.J.P.], and at this point, I tell [Javier], why can't we just have her in our home? We have a three-bedroom, two-bath home. It's huge. We have the room. And he said no because [he had] already raised [M.J.P.'s biological father]; that's too much responsibility, and we have our lives where we come and go, and we work, and we come and go. . . . [M.J.P.'s] father is [Javier's] nephew, the one [who is] in jail, so that's why – that [was] his comment to me. So at that point, I tell him he's – she's family. I'm married to you. She's my family.

Cristina B. testified that Javier S. finally relented and agreed. Cristina B. testified that she was very proud of him when M.J.P.'s biological mother stood up and proclaimed, "No, I would rather my daughter go to foster care than [to] that family," pointing at Javier S. and Cristina B. Javier S. stood up said, "Well, then, we'll take her." Cristina B. testified that she was very proud of Javier S., explaining, "I knew that that was the reason why I married him." M.J.P. was placed with Javier S. and Cristina B. on May 23, 2014. Cristina B. testified that they "learned to be parents overnight." They stayed up with M.J.P., because she would cry and have nightmares. Cristina B. testified they all adjusted and then there were no more nightmares. They were co-parents who shared responsibility. They were "a married couple with a brand-new baby that was not a brand-new baby, but she was a walking-talking baby that could tell you she was hungry, I hurt, I want this, I want that." Cristina B. testified that Javier S. is a good parent and loves M.J.P. She testified that they disagreed about discipline and that she was the stricter parent. Cristina B. gave the example of M.J.P.'s pronunciation of words. She wanted to make sure M.J.P. knew how to pronounce certain words correctly, and Javier S. thought M.J.P. should be allowed to speak how she wanted to. "I would say, 'No, just pronounce the word correctly.' So, he thought that was discipline, and it wasn't discipline." Cristina B. testified that she had never spanked M.J.P.

According to Cristina B., she would never cut off contact with Javier S. However, she noted that he did cut off contact between M.J.P. and her. Javier S. did not want her to talk to M.J.P. Cristina B. testified that before Javier S. filed for divorce, he was often going out alone at night. And, when he filed for divorce, he stopped going out at night. Cristina B. attributed the divorce to Javier S.'s daily interactions with an ex-girlfriend on Facebook. According to Cristina B., during a counseling session, the counselor asked Javier S. if he had a girlfriend, and he replied, "No." He did, however, state that he and the woman had dated in the past and that maybe something would develop in the future. Javier S. told Cristina B. that he wanted a divorce because he was tired, did not love Cristina B., thought she spent too much money, and thought she worked too much.

Cristina B. testified that from 1999 to 2007, she was a high school teacher. From 2008 to 2011, she was a community liaison for Northeast ISD. As a community liaison, her job was to "bring the community into the school and get the parents involved in the student's education." Cristina B. explained that now she works at a local television station as a community affairs director for television and radio. Cristina B. testified that her work schedule is "very flexible." She can do her job from home or anywhere else. Cristina B. testified that she is financially stable.

Cristina B. testified that the only person to see her new home was the evaluator. She noted M.J.P.'s ad litem (the same ad litem who has filed this appeal) never went to her home. The caseworker did not come to her home. Cristina B. testified that she learned M.J.P. would be living with Javier S. on November 12, 2015 in a conference room at the Department's offices. She was told she would "be a sitter or a backup" for Javier S. and that M.J.P. would be living with Javier S. According to Cristina B., the Department employees "kept saying that [M.J.P.] was going with Javier because he [is] a blood relative." No arrangements were made for Cristina B. to have visitation with M.J.P. That Friday, she called Javier S. and asked if he would be willing to work out a visitation agreement and he agreed. Then he called back and told Cristina B. she could not

pick up M.J.P. because the caseworker, Yesenia Moreno, said she could not pick up M.J.P. anymore. Cristina B. called Moreno, who said that Cristina B. could not pick up M.J.P. because she lived with Javier S. now. She later was able to set up visitation at the daycare. Cristina B. testified that cutting her out of M.J.P.'s life would "devastate" M.J.P. because she thinks of Cristina B. as her mommy.

Cristina B. testified that the Department was not transparent or fair to her. The Department never gave her clear answers. She noted that when the caseworker found out about the divorce, she and Javier S. were told the Department would do two home studies. They were told the Department would look at them individually because M.J.P. had been placed with them for eighteen months. Cristina B. testified that "[i]t did not happen like that." Cristina B. had to go back into court to "force" them to do what they promised to do.

When asked about her plans for M.J.P.'s future, Cristina B. testified that she saw M.J.P. as "an educated, well-rounded, bilingual, bicultural individual knowing her full background and understanding that and making a difference in the community." She testified that education has always been a priority in her family. She would encourage interactions with Javier S. and would make sure M.J.P. knew both mommy and daddy love her. Cristina B. believed her daughter should have both parents involved in her life. Cristina B. believed she would be more protective of M.J.P. Cristina B. testified that she believes Javier S. is a good parent, but that he needs to have a more open mind about a lot of things when it comes to M.J.P.'s upbringing.

The ninth witness to testify was Yesenia Moreno, the caseworker from the Department's adoption unit. She testified that she did not have any concerns about parenting for either Cristina B. or Javier S. and that both Javier S. and Cristina B. came back as "positive placements." During her initial visits with them at their home, they looked "appropriate" and M.J.P. "looked very happy." M.J.P. seemed bonded to both parents. Toward the end of the process, "the push worker,"

the adoption worker who does the paperwork for the adoption, visited Cristina B. and Javier S.'s home to conduct the home interview for the home-study update. After her visit, she emailed Moreno and informed her that Javier S. had recently filed for divorce. Moreno was concerned because neither Javier S. nor Cristina B. had informed her of any marital problems or any plans to divorce. Cristina B. told Moreno that she was not aware Javier S. had filed for divorce. According to Moreno, in the ten years of working on adoptions, she had never been faced with such a situation.

Moreno testified that initially, her supervisor told her to meet with Javier S. and Cristina B. and explain that once they were divorced and living separately, the Department could conduct home studies on each of them and determine from the home studies which placement was the best option for M.J.P. Moreno admitted that the Department did not do what it said it was going to do. Instead, the Department made a decision to place M.J.P. with Javier S. before any home study was conducted. Moreno testified that when she talked with M.J.P., M.J.P. mentioned Javier S. more than Cristina B. According to Moreno, she was "not denying that [M.J.P.] wasn't bonded to both of them, but she appeared to be more bonded to [Javier]." Moreno testified that "[e]verything happened right before Thanksgiving, and with the holidays and everything, and then we got called into court right away." Moreno noted that at the meeting the Department had with Javier S. and Cristina B., "it appeared that [Javier] had been the primary caregiver for [M.J.P.] during the time that she had been placed with them, and . . . he was also a blood relative, which by law we're required to look at blood relatives first." So, the Department decided to place M.J.P. with Javier S., but allow the parties to arrange visits. Moreno testified that after Cristina B. called the trial court and said she was going to possibly do a news story about this case, Moreno's supervisor ordered any visits with Cristina B. to be supervised.

When asked about spanking, Moreno testified that M.J.P. told her Cristina B. yelled at her and spanked her on the bottom. "[S]he kind of simulated a spanking motion on her bottom and stated that she – she would hurt me like this when I had accidents." According to Moreno, Javier S. told her that when he and Cristina B. first had M.J.P. in their home, there was one incident where Cristina B. wanted to spank M.J.P, but he told Cristina B. that they were not allowed to spank her under the rules set by the Department. Javier S. told Moreno that as far as he knew, that was the only "spanking" incident. When asked why the Department did not recommend a 50/50 split, Moreno explained the Department did not because this is an adoption case.

The last witness to testify was Javier S., who was representing himself. He testified that he is biologically related to M.J.P. as her paternal great-uncle. Javier S. first explained that he did not actually raise his two nephews (one of whom is M.J.P.'s biological father). Although both nephews had been imprisoned, Javier S. stated that he should not be blamed for any parenting faults because he was only fourteen years old when his nephews came into his life. His nephews were about six or seven years of age, and Javier S. helped babysit them and "provide recreational involvement, recreational time with them." Javier S. testified that their mother (his sister) was their primary caregiver. When his nephews were fourteen years old and Javier S. was twenty-one years old, he would "take them to Arcades and . . . that kind of stuff."

Javier S. did not agree with the characterization that he had relied on Cristina B. financially. He testified that he was employed during the majority of his marriage. He had been a salesperson at the same local television station that employed Cristina B. He stated that he presently works for San Antonio Independent School District as a marketing manager. Javier S. explained that he had only been unemployed from November 2013 to February 2014. Javier S. testified he had been enrolled in an online graduate school program and then later at the satellite campus. He testified that he paid for his tuition through student loans, which were presently in deferment. According to

Javier S., he prioritizes education and has enrolled M.J.P. at Bonham Academy, where he plans for M.J.P. to attend kindergarten to sixth grade. Javier S. testified that he then planned to enroll M.J.P. at the Young Women's Leadership Academy. He also planned for M.J.P. to attend college.

Javier S. testified that he has attended every doctor visit with M.J.P. He noted that his work schedule gives him flexibility. He emphasized that M.J.P.'s development is a priority to him and that he attends all of M.J.P.'s school activities. He noted that the Department's initial plan with M.J.P. was reunification with her biological parents and that he was initially reluctant because the plan was for her to return to her biological parents. Javier S. testified that since M.J.P. has been born, he has been the person with whom she has bonded the longest. He stated that he had been the person who, more than any other person, has been a positive influence in her life. Javier S. testified that he has been a consistent presence to make sure that all of her needs had been met.

When asked if he was able to adopt M.J.P., whether he believed it is important for M.J.P. to have access or visitation with Cristina B., Javier S. replied, "No." When asked why he felt that way, Javier S. replied, "Because Cristina has displayed anger issues. Her parenting skills are – are very – there's – there's consequences that are – that I don't agree with, such as spanking and emotional, I guess, bullying that – emotional bullying." When asked about spanking, Javier S. admitted he was only referring to a single incident. According to Javier S., in August 2015, during tax-free weekend, he, Cristina B., and M.J.P. were at Old Navy in the dressing room trying on clothes. Cristina B. picked up M.J.P., turned around and said, "Let's go," and spanked her. Javier S. said that it was a punishment for not moving fast enough. Javier S. admitted that he did not report the incident to the Department.

With respect to the "emotional bullying," Javier S. claimed that Cristina B.'s parenting style was too strict. He stated that Cristina B. would say things like to M.J.P. like, "I can't wait until you're adopted so that I could spank you." Javier S. testified that he would regularly bathe

M.J.P. and get her ready for bed in the evening, and Cristina B. would come home from work angry. If M.J.P. was "fussy or just being a kid," Cristina B. would say, "Stop it, or I'm going to bathe you." Javier S. testified that the "final straw . . . was when [Cristina's] involvement with [M.J.P.] became more negative, or just increased," and he "no longer felt that [he] could look at this woman and say she's – [he] just felt that woman is not the mother of [his] children and that was it." Javier S. admitted that he did not make the caseworker, the evaluator, or the therapist aware of his feelings about Cristina B.'s emotional bullying until after he filed for divorce.

Javier S. testified that when he married Cristina B., he did want to have children with her, but Cristina B. stated that she needed a Mercedes SUV to accommodate a child and she needed him to find a job paying $120,000 per year because she would not work for three to four years. And, Javier S. was adamant that he had not had an affair during his marriage.

At the end of Javier S.'s testimony, the trial court asked Javier S. a few questions:

Court: Okay. I have a question for you, okay? I talked to the child. So is it a free-for-all at your house? And she can do whatever she wants?

Javier S.: No, ma'am.

Court: And then, there's guidelines at the other – with the other parent, and you just let her kind of run the whole place?

Javier S.: No, ma'am. She can – she can choose to – if we're going to color or watch TV and play dough or just have a couple of things, but they're not consequences to when she doesn't listen to me. I don't say we're going to go – today's coloring day; today is, you know – if it's not related to school, today is play dough day. She has that say-so. "Honey, what do you want to do?" "I want to color." The only objection I have is when it comes to her having a say-so in what we do after school is the weather because of her asthma-like symptoms.

At the end of the hearing, the trial court took the matter under advisement, stating that it wanted to read everything. The court noted that M.J.P. was "very lucky" because she "has two loving people" who would like to adopt her. The trial court later denied Javier S.'s petition and granted Cristina B.'s petition to adopt M.J.P., finding that adoption by Cristina B. was in M.J.P.'s

best interest. Morrison, the attorney and guardian ad litem for M.J.P., then filed this notice of appeal.

## ISSUES ON APPEAL

Morrison has specified sixteen issues in her appellant's brief. However, in reviewing her brief, we conclude that only three issues are presented: (1) whether the trial court abused its discretion in granting Cristina B.'s petition for adoption and denying Javier S's petition for adoption; (2) whether the trial court erred in waiving the requirement of consent by the Department to M.J.P.'s adoption; and (3) whether the trial court abused its discretion in interviewing M.J.P. in chambers.

## ABUSE OF DISCRETION IN GRANTING/DENYING PETITIONS

Section 162.016 of the Texas Family Code provides that "[i]f the court finds that the requirements for adoption have been met and the adoption is in the best interest of the child, the court shall grant the adoption." TEX. FAM. CODE ANN. § 162.016(b) (West 2014). Here, the trial court found that adoption of M.J.P. by Cristina B. was in M.J.P.'s best interest. In her brief, Morrison, the ad litem, first argues the evidence is legally and factually insufficient to support the trial court's finding that granting Cristina B.'s petition to adopt M.J.P., and denying Javier S.'s petition, is in M.J.P.'s best interest. However, legal and factual sufficiency are not independent grounds of error in an adoption proceeding like this one, but instead are relevant factors in deciding whether the trial court abused its discretion. *See In re J.G.*, 412 S.W.3d 83, 88 (Tex. App.—Fort Worth 2013, no pet.). Thus, the issue presented on appeal is whether the trial court abused its discretion in granting Cristina B.'s petition to adopt M.J.P. and in denying Javier S.'s petition to adopt. *See id.*

The decision to grant or deny a petition for adoption is within the discretion of the trial court, and an appellate court may not set aside a trial court's order granting or denying a petition

for adoption except for abuse of discretion. *In re W.E.R.*, 669 S.W.2d 716, 716 (Tex. 1984); *In re J.G.*, 412 S.W.3d at 87. As noted, legal and factual sufficiency are not independent grounds for review, but instead are relevant factors in determining whether the trial court abused its discretion. *In re J.G.*, 412 S.W.3d at 88. In this context, an appellate court "is not entitled to substitute its judgment for that of the trial court." *In re W.E.R.*, 669 S.W.2d at 716-17. "The trial court, as fact finder, has the sole authority to resolve credibility issues and conflicts within the evidence." *In re F.G.*, No. 04-04-00681-CV, 2005 WL 3477830, at *3 (Tex. App.—San Antonio 2005, no pet.) (mem. op.). "The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Lide v. Lide*, 116 S.W.3d 147, 152 (Tex. App.—El Paso 2003, no pet.). An abuse of discretion does not occur as long as "some evidence of a substantive and probative character" supports the trial court's decision. *Id.*; *In re D.D.T.*, No. 11-04-00022-CV, 2005 WL 283579, at * 2 (Tex. App.—Eastland 2005, no pet.). "Furthermore, an abuse of discretion does not occur when the trial court bases its decision on conflicting evidence." *In re D.D.T.*, 2005 WL 283579 at *2.

Here, in granting Cristina B.'s petition and denying Javier S.'s, the trial court found that granting Cristina B.'s petition was in M.J.P.'s best interest. The best-interest determination is a wide-ranging inquiry, and the Texas Supreme Court has set out some factors relevant to the determination:

- the desires of the child;

- the emotional and physical needs of the child now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the best interest of the child;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

- any excuse for the acts or omissions of the parent.

*See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, and not every factor must be proved. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

In its order, the trial court stated that it considered evidence presented relating to the following factors: the desires of the child; the child's emotional and physical needs now and in the future; the emotional and physical needs of the child now and in the future; the potential emotional and physical dangers to the child now and in the future; the parental abilities of Cristina B. and Javier S.; the extent of the investigations and services provided by the Department; what programs would be available to Cristina B. and Javier S.; the plans for the child as presented by Cristina B. and Javier S.; the stability of Cristina B.'s and Javier S.'s homes; the relationships between the child and the prospective parents; the protective capacities of Cristina B. and Javier S., and which individual could best protect the child; all the information and factors reported via the court-ordered home studies of Cristina B. and Javier S.; the age of the child; the child's need for stability and structure; the child's needs for support, both financial and emotional; "the future relationships as between the child and the individuals"; and "the interaction between the parties and the child as observed in the courtroom."

The trial court then made ninety-nine findings of fact in support of its decision. In particular, the trial court found that both Cristina B. and Javier S. love and care for M.J.P. However,

the court noted that Javier S. had been initially reluctant to bring M.J.P. into his and Cristina B.'s home while Cristina B. had been an advocate for M.J.P.'s placement in their home. The trial court found that before home studies were completed and in order to avoid placing M.J.P. in an unfamiliar foster home while waiting for the home studies to be completed, the Department placed M.J.P. with Javier S. and Cristina B. while they were married. The trial court noted that Cristina B. would intervene with discipline and would redirect M.J.P., which was an appropriate manner of discipline. The trial court found that Cristina B. and M.J.P. had bonded, that M.J.P. is "very happy when she is with" Cristina B., and that Cristina B. was "constantly talking and thinking about M.J.P., making plans for her, thinking about her future and advocating for" her. The trial court found that Cristina B. wants Javier S. to be a part of M.J.P.'s life, but that Javier S. does not want Cristina B. to be a part of M.J.P.'s life, which the trial court found would not be in M.J.P.'s best interest emotionally. The trial court also found that Cristina B. would be "more protective from relatives who could cause danger" and that Javier S. "is dependent on his mother and sister for providing care for [M.J.P.]" The trial court also found that Cristina B. had more financial resources available to provide for M.J.P.

In support of her argument that the trial court should have granted Javier S.'s petition, Morrison, the ad litem, points to testimony from Dr. Ponce, the psychologist. However, Dr. Ponce's testimony in this case is not persuasive as she never met with Cristina B., never saw her and M.J.P. interact with one another, and was under the impression that M.J.P. had only lived with Cristina B. for a few months. Morrison also points to the testimony of Medrano, the director of the daycare. However, Medrano also did not have much contact with Cristina B. and testified that M.J.P. needed both parents. Morrison also argues the evidence supports that Javier S. has superior parenting abilities and that Cristina "has the potential to present an emotional and physical danger to M.J.P." However, the trial court did not find Javier S.'s testimony about Cristina B.'s emotional

bullying and anger issues to be credible. During his testimony, Javier S. claimed Cristina B.'s actions were a danger to M.J.P. but admitted that he did not report Cristina B.'s actions at the time they occurred and only did so after he filed for divorce.

It is clear that the trial court found both Cristina B. and Javier S. to be kind and decent people worthy of adopting M.J.P. It is also clear that a major factor in the trial court granting Cristina B.'s petition was Cristina B.'s testimony she would allow contact with Javier S. after the adoption because doing so was in M.J.P.'s best interest. In contrast, Javier S. testified that he did not believe it was in M.J.P.'s best interest that M.J.P. have contact with Cristina B. after the adoption. It is also clear the trial court appreciated Cristina B.'s parenting style of structure and discipline and the plans she had for M.J.P.'s education and future. Given this record, we cannot say that the trial court abused its discretion in granting Cristina B.'s petition to adopt and denying Javier S.'s petition.

## WAIVER OF CONSENT BY DEPARTMENT

In her second issue, appellant argues the trial court erred in waiving the requirement that the Department consent to M.J.P.'s adoption. Section 162.010 of the Family Code provides that "[u]nless the managing conservator is the petitioner, the written consent of a managing conservator to the adoption must be filed." TEX. FAM. CODE ANN. § 162.010(a) (West 2014). Section 162.010 allows the court to "waive the requirement of consent by the managing conservator if the court finds that the consent is being refused or has been revoked without good cause." *Id.* Here, the trial court found that the "Department's decision to exclude [Cristina B.] and her counsel from any staffing shows a lack of good faith by the Department" and that waiver of the consent requirement was "in the best interest of the child." The record supports both these findings. There is ample evidence in the record that the Department initially told Cristina B. she would be considered for placement and that home studies would be conducted on both her and Javier S. Testimony from

Department employees showed that the Department had not complied with this promise and had made the decision to place M.J.P. with Javier S. before any home studies could be conducted. Moreno admitted that "[e]verything happened right before Thanksgiving. And with the holidays and everything . . . it didn't give us the time." Inaccurate and incorrect information was given to Dr. Ponce. The record supports the finding that the Department did not conduct a sufficient investigation into which placement was in M.J.P.'s best interest. And, there is nothing in the record to indicate why the Department would withhold consent to Cristina B. adopting M.J.P. Moreno admitted the Department had no concerns about Cristina B.'s parenting skills. Moreno admitted that Cristina B. and M.J.P. were bonded. Velasquez, the Department evaluator, gave higher marks for Cristina B.'s home study than Javier S.'s home study. Given this record, we find no abuse of discretion by the trial court in waiving the requirement of consent by the Department.

## INTERVIEW OF CHILD

Finally, appellant argues the trial court erred in conducting an ex parte, private interview with M.J.P. and then relying on the interview in making its decision. With regard to whether the trial court erred in conducting an ex parte, private interview with M.J.P., appellant waived any error on appeal by not making an objection in the trial court. *See* TEX. R. APP. P. 33.1. With regard to whether the trial court erred in relying on information gained from M.J.P. in making its decision, any error is harmless because, as explained previously, there is other evidence sufficient to support the trial court's decision in this case.

## CONCLUSION

Having determined Morrison's issues on appeal are without merit, we affirm the trial court's Order Pursuant to Trial on Competing Petitions for Adoption. In the trial court's order, it found that it is in M.J.P.'s interest to implement a "transition period" and set out specific dates for this transition period. Because these dates have now passed, the transition period as laid out in the

order is moot. Therefore, we modify the trial court's order to include new dates for the transition period:

| Dec. 25, 2016 | 1 visit between child & CB for 1 ½ hours |
| Dec. 26, 2016 – Dec. 31, 2016 | 2 visits between child & CB for 1 ½ hours, 1 therapeutic session with Dr. Ponce |
| Jan. 1, 2017 | 1 visit between child & CB for 1 ½ hours |
| Jan. 2, 2017 – Jan. 7, 2017 | 3 visits between child & CB for 1 ½ hours, 1 therapeutic session with Dr. Ponce |
| Jan. 8, 2017 – Jan. 14, 2017 | 4 visits between child & CB for 1 ½ hours, 1 therapeutic session with Dr. Ponce |
| Jan. 15, 2017 – Jan. 21, 2017 | 5 visits between child & CB for 1 ½ hours, 1 therapeutic session with Dr. Ponce |
| Jan. 22, 2017 – Jan. 28, 2017 | 4 visits between child & CB for 1 ½ hours, 1 overnight visit, 1 therapeutic session with Dr. Ponce |
| Jan. 29, 2017 – Feb. 4, 2017 | 4 visits between child & CB for 1 ½ hours, 2 overnight visits, 1 therapeutic session with Dr. Ponce |
| Feb. 5, 2017 – Feb. 11, 2017 | 4 visits between child & CB for 1 ½ hours, Weekend visit, 1 therapeutic session with Dr. Ponce |
| Feb. 12, 2017 – Feb. 20, 2017 | Child placed with CB, ADOPTION Feb. 21, 2017 |

As modified, we affirm the trial court's order.

Karen Angelini, Justice