

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00047-CV
No. 02-23-00048-CV

_____

IN THE INTEREST OF J.W., A CHILD

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court Nos. 20-6433-442, 21-5531-442

Before Sudderth, C.J.; Bassel and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

Appellants Adam and Lilly Hamilton[1] appeal from the trial court's amended order (the Order) in the adoption proceeding that they filed regarding two-year-old J.W. (Jacob) and in the child protection suit concerning Jacob in which the Hamiltons had intervened. The Order, which was effective in both proceedings, dismissed the Hamiltons from the child protection suit and denied their motion to waive some of the Family Code's adoption requirements.[2] Specifically, the Hamiltons had requested a waiver of the requirements that the child reside with a person or persons wanting to adopt and that the child's managing conservator consent to the adoption. *See* Tex. Fam. Code Ann. §§ 162.009, 162.010. The child had not been living with the Hamiltons, and the child's managing conservator, the Department of Family and Protective Services (the Department), had refused to consent to the Hamiltons' adoption.

In four issues, the Hamiltons argue that they established as a matter of law that the Department's refusal to consent to the adoption was without good cause (issue four) and that the trial court erred by signing the Order and denying their motion to vacate the trial court's Order (issue one), by granting the Department's motion for

---

[1]To protect the anonymity of the child associated with this appeal, we use pseudonyms to refer to him, Appellants, and the family with whom he has been living. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The Order further denied all other relief requested by the Hamiltons.

directed verdict (issue two), and by denying their request to waive the consent requirement (issue three). Because some evidence supported the trial court's finding and the Hamiltons' evidence was insufficient to prove as a matter of law that the Department lacked good cause, we will affirm.

## Background

Jacob's biological mother (Mother) gave birth to Jacob in August 2020, while Mother was incarcerated. Mother had three other children (the siblings) who had previously been taken into the Department's care because of Mother's drug use. Those children had been placed with Natalie and Charles Kent, but at some point, the placement was changed to the Hamiltons. The siblings were still with the Hamiltons when Jacob was born.

Two days after Jacob's birth, the Department filed a child protection suit regarding Jacob and took him into its care. Mother wanted Jacob placed with the Kents, and the Department agreed to the placement. Because the Kents had a "supportive relationship and mentoring role" with Mother, the Department considered the Kents to be Jacob's fictive kin as well as foster parents.

In December 2020, i.e., around four months after Jacob's birth, the Hamiltons adopted Jacob's siblings. In April 2021, when Jacob was eight months old, the Hamiltons intervened in the child protection suit seeking termination of Mother's parental rights to Jacob, termination of the father's rights, and appointment as

3

managing conservators. After Mother's attorney objected that the Hamiltons lacked standing to intervene, they filed a petition for adoption in a separate proceeding.

Before a trial court may grant an adoption, the child must have resided for at least six months with the person seeking the adoption. *Id.* § 162.009. Further, unless the person seeking adoption is the child's managing conservator, the managing conservator must give written consent for the adoption. *Id.* § 162.010. However, the trial court may waive the residency requirement if doing so is in the child's best interest, and the managing conservator's consent is not required if the trial court finds that consent is being refused without good cause. *See id.* §§ 162.009, 162.010. In the Hamiltons' intervention petition, they asked the trial court to waive the consent requirement.

The trial court signed temporary orders allowing the Hamiltons ten hours' visitation per week. In December 2021, the Kents intervened in the child protection suit. They requested continuation of Jacob's placement with them, termination of any rights that the Hamiltons had to Jacob, and termination of Jacob's biological parents' parental rights. In early 2022, both biological parents voluntarily relinquished their parental rights.

In June 2022, the Department moved to dismiss the Hamiltons as intervening parties in the child protection suit and to dismiss their adoption petition on the basis that the Department had not consented to their adopting Jacob. The Hamiltons then

4

filed in the adoption proceeding a motion to waive the consent and residency requirements.[3]

The trial court held a hearing in August 2022. The Hamiltons called four witnesses: Carla Johnson, the director of Kids First, Inc., a child placement agency; Christina Ross, the caseworker; Dr. Brooks McKenzie, a psychologist; and Lilly Hamilton. Most of the testimony centered on three topics: (1) the Hamiltons' parenting ability and readiness to adopt, (2) federal and state policy regarding sibling placements in foster care, and (3) the fact that Jacob was not placed with the Hamiltons despite the siblings being in their care.

Regarding the first topic, Johnson testified that except for one lapse, the Hamiltons had maintained their licenses as a foster home and adoptive home throughout the proceedings. She also testified that the Kents had previously been licensed through her agency but were not still licensed with that agency at the time of trial. However, there was "nothing that was concerning or a reason [the agency] had

---

[3]On appeal, the Hamiltons do not cite Section 162.009 and do not make any express arguments challenging the trial court's failure to waive the residency requirement, and that ground provides an alternative basis on which to affirm the Order's denial of their petition. *See* Tex. Fam. Code Ann. § 162.009(a). However, even if we assumed for purposes of this appeal that they impliedly challenge that part of the Order through their assertions that it is in Jacob's best interest to be with his siblings, *see id.* § 162.009(b) (stating trial court may waive residency requirement if doing so is in child's best interest), we would not need to address the argument because of our holding regarding the consent requirement. *See* Tex. R. App. P. 47.1.

to close them," and she had no more information about why the Kents had left the agency.

Johnson further testified about the home study that she had prepared for the Hamiltons. Ross was also asked about a home study that the trial court had ordered the Department to conduct on the Hamiltons' home, separate from the one that Johnson's placement agency had done. That order had been signed before Ross became the caseworker, and she testified that she did not know whether that study had been done. However, Lilly testified that the Department had done the study.

Dr. McKenzie testified about a child's attachment to caregivers and whether he believed that Jacob would do well in the Hamiltons' care.

- Dr. McKenzie explained that a child starts forming attachments between six months and eighteen months of age and that after eighteen months, "it starts to explode until 3, 4, 5 years old" in emotional age.

- At two years old, Jacob was "in that explosive stage."

- Asked if a child would be damaged by being moved from a home in which the child had formed a secure attachment to the caregivers, Dr. McKenzie responded, "[T]hat will absolutely devastate a child."

- Nevertheless, based on his observations of the Hamiltons and the siblings, he thought that a child moving into the Hamiltons' home would

6

probably experience the same positive outcome as the siblings had. He described the Hamiltons' home as an "ideal placement for any child."

Dr. McKenzie could not testify about the attachment that Jacob had to the Kents because he had not observed them together. Ross, however, stated that Jacob is doing well with the Kents, that theirs was the only home he had ever known, that he appeared to be bonded with the Kents and their children, and that she believed it would be detrimental and traumatic to move him from that home. She stated that in her opinion, considering all of his needs, it would not be in his best interest to move him. The Hamiltons produced no evidence to contradict Ross's testimony about how well Jacob was doing in the Kents' care, and Lily stated that as far as she knew, Jacob loved the Kents and seemed happy.

As for policies around sibling placements, the Hamiltons asked Ross to read from various Department publications relating to the Department's policy of placing siblings together.

- From a Department document entitled, "CPS Rights of Children and Youth in Foster Care," Ross read aloud a section stating that a child has the right to live with their siblings in foster care "if possible," and if not, to know why. The section further states that "[i]f there are no safety or other compelling reasons" why a child in foster care cannot live with their siblings, then it is "the caseworker's job to try and find a home" in which the siblings can live together.

7

- The Department has a "Placement Process Resource Guide," which is intended to help Department employees "do [their] job better" but is not a substitute for Department policy. From that document, Ross read aloud a section stating that "[f]ederal law and guidance, state law, and best practice call for" the Department and courts to "prioritize placements with relatives and other individuals with whom the child is connected," including siblings who have been adopted.

- Ross also read a section of the same guide stating that under federal law, the Department "must make reasonable efforts to place siblings together unless [it] documents that doing so is contrary to the safety or well-being of one of the siblings" and that if the siblings are not placed together, the Department must provide for visitation or other interaction unless doing so would be unsafe.

- Ross had been the caseworker for only four months, but she stated that she could not recall any documentation of efforts to place the siblings together, that the case file did not contain documentation of conversations with the Hamiltons, and that she was not aware of any safety concerns with the Hamiltons' home.

Each side elicited testimony about Jacob's placement with the Kents instead of the Hamiltons.

- Ross testified that it was her understanding that the Hamiltons had declined to take Jacob when he was first taken into care, and she said that the Hamiltons' not wanting him to be placed in their home was a "compelling reason" to place him elsewhere. Ross further testified that "[r]egardless of that, . . . the least restrictive [placement] would have been considered first, [and] one of those would be to place with fictive kin, which the [Department] also considers like [a] relative. And [the Department] would consider the request of the parent." Ross testified that Mother wanted Jacob placed with the Kents and that the Kents maintained a relationship with both Mother—with whom they had a supportive and mentoring relationship—and the biological father while ensuring all contact between the parents and Jacob was safe. Those considerations supported placement with the Kents.

- Lilly disputed that the Hamiltons had been offered Jacob's placement when he was taken into care; she contended that the Department had not contacted them at that time. However, she and Adam were aware of Jacob's birth because Natalie sent her a picture of Jacob after his birth.

- Lilly did not deny that she and Adam did not want to take Jacob at that point—she testified that she and Natalie were both concerned about

9

how the siblings would be affected if the Hamiltons took in Jacob and he was later reunited with Mother.

- Lilly stated that she and Natalie had discussed the Kents' taking Jacob initially and the Hamiltons' taking placement of him if his biological parents' rights were terminated.[4]

- Lilly said that she told a caseworker[5] that she and her husband "would go ahead and take" Jacob, and she also said that based on statements from the caseworker, "[her] understanding [was] that the caseworker understood [that] the Kents would serve as a bridge placement until it was more secure with [Mother]'s outcome" and that the caseworker "already knew about the plan" when Lily mentioned it to her. However, Lily did not say when her conversation with the caseworker took place.

- On cross-examination, Lilly acknowledged that when Jacob was born, she did not tell the Department that she and her husband wanted Jacob

---

[4]In addition to this conversation, Lilly also testified about an earlier conversation in January 2020, when Lilly first learned from Natalie that Mother was pregnant; Lilly testified that at that time, she told Natalie that the Hamiltons would be excited to have Jacob. However, at that point, which was early in Mother's pregnancy, the Department was not involved, and thus there was no need for a placement decision.

[5]Ross was the third caseworker on the case, and the siblings also had a caseworker. In most of Lily's testimony, when she referenced a caseworker, she did not identify the caseworker to whom she was referring.

and that, even after they adopted the siblings, did not ask to be Jacob's placement. Lilly admitted that she did not mention to the caseworker that they wanted Jacob until he was over five months old. She further acknowledged that they had contact with the Department because of their adoption of the siblings.

- Lilly testified that after Jacob was born, they contacted the caseworker more than ten times about arranging a visit, but the caseworker only once returned their call to say that she would get back to them, and then she never did. She did not say, however, when after his birth these contacts occurred.

- Lilly further acknowledged that after Jacob was placed with the Kents in August 2020, she and her husband did not ask the Kents to see him and did not meet him until January 2021. When Jacob had issues with a hemangioma, the Hamiltons did not ask the Kents how his doctor's appointments were going.

- The Department asked Lily about a time that one of the siblings, a six-year-old, brought a pocketknife to a visit with Jacob. Lily thought it was appropriate for the child to have the pocketknife at the visit because he was "very responsible" and her husband had "spent a lot of time talking to him about it."

11

After the Hamiltons rested, the trial court granted the Department's motion for a directed verdict, and the court signed an order that denied the Hamiltons' motion to waive the consent and residency requirements. The Hamiltons appealed, but this court dismissed the appeal because the appealed-from order was neither a final judgment nor an interlocutory appeal authorized by statute.

After the appeal's dismissal, the Hamiltons filed a motion to vacate the trial court's order. The trial court then signed the Order, which (1) found that the Hamiltons had not proved that the Department lacked good cause to withhold consent, (2) denied the Hamiltons' motion to waive the consent and residency requirements, (3) terminated their weekly visitation with Jacob and their relationship with him, (4) denied all other requested relief, and (5) dismissed them from the suit. The Hamiltons filed an appeal from both proceedings.

## Discussion

In the Hamiltons' first issue, they argue that the trial court erred by signing the Order and denying their motion to vacate.[6] In the Hamiltons' second issue, they argue that the trial court erred by granting the Department's motion for directed verdict on the Hamilton's claim that the Department lacked good cause to refuse to consent to

---

[6]Under their first issue, the Hamiltons also argue that they had standing to seek adoption. We have not found in the record any challenge to the Hamiltons' standing to seek adoption. Although the Department moved to dismiss their adoption petition, it did so on the basis that the Department had not granted consent for the adoption. Regardless, we agree that the Hamiltons had standing. *See* Tex. Fam. Code Ann. § 102.005.

their adoption of Jacob. In their third issue, the Hamiltons argue that the trial court erred by denying their request to waive the Department's consent to their adoption of Jacob. Finally, in their fourth issue, they argue that they established as a matter of law that the Department was without good cause to refuse consent to their adoption of Jacob. Because the Hamiltons argue these issues together, we address them together.

## I. Burden of Proof at Trial and Standard of Review on Appeal

We generally review a trial court's decision to grant or deny an adoption petition for abuse of discretion. *In re J.G.*, 412 S.W.3d 83, 87 (Tex. App.—Fort Worth 2013, no pet.). However, when the petitioner is not the managing conservator and the managing conservator has not consented to the adoption, the trial court may not grant the adoption unless it first finds that the managing conservator's consent was refused or revoked without good cause. Tex. Fam. Code Ann. § 162.010. As the parties seeking waiver of the consent requirement, the Hamiltons had the burden to prove the Department's lack of good cause. *See In re M.P.J.*, No. 14-03-00746-CV, 2004 WL 1607507, at *4 (Tex. App.—Houston [14th Dist.] July 20, 2004, pet. denied) (mem. op.). "A managing conservator has good cause to refuse consent when it has a good[-] faith reason to believe the best interest of the child requires that it withhold consent." *Id.* (citing *Chapman v. Home*, 561 S.W.2d 265, 267 (Tex. App.—Fort Worth 1978, no writ)). Thus, the Hamiltons had to prove that the Department did not have a good-faith reason to believe that refusing consent was in Jacob's best interest. *See id.*

13

Although the Department moved for directed verdict, in a bench trial, a "motion for directed verdict" is more properly termed a "motion for judgment." *Est. of Pandozy*, No. 05-19-00755-CV, 2021 WL 711500, at *3 (Tex. App.—Dallas Feb. 22, 2021, no pet.) (mem. op.); *see Matheus v. Sasser*, 164 S.W.3d 453, 457 (Tex. App.—Fort Worth 2005, no pet.). In a nonjury case, the trial court can grant a motion for judgment on either legal-sufficiency or factual-sufficiency grounds. *Qantel Bus. Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 304 (Tex. 1988). Here, the Department moved for judgment on the basis that "we haven't heard any evidence that says that the Department does not have a good faith belief to believe that it would be in the best interests of this child to remain where he's at." In other words, the Department moved for judgment on the basis of the legal insufficiency of the evidence. *See Parks v. Migl*, No. 13-22-00208-CV, 2023 WL 7860792, at *6 (Tex. App.—Corpus Christi–Edinburg Nov. 16, 2023, pet. filed) (mem. op.) (noting that a claim that no evidence supports a verdict is a challenge to the legal sufficiency of the evidence).

On appeal, the Hamiltons argue that they established as a matter of law the Department's lack of good cause. *See Cath. Diocese of El Paso v. Porter*, 622 S.W.3d 824, 834 (Tex. 2021) (stating that when an appellant attacks the legal sufficiency of an adverse finding on an issue on which the appellant had the burden of proof, the appellant must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue). Accordingly, in our review, we must first examine the record for evidence that supports the finding, while ignoring all evidence

14

to the contrary. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). If no evidence supports the finding, then we will examine the entire record to determine if the contrary position is established as a matter of law. *Id.* We will sustain the issue only if the contrary position is conclusively established. *Id.* Evidence conclusively establishes a fact when the evidence leaves "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply Inc.*, 644 S.W.2d 443, 446 (1982)).

Regarding the motion to vacate, we review the denial of such a motion for abuse of discretion. *Cornerstone Alternatives, Inc. v. Patterson Oldsmobile-GMC-Toyota, Inc.*, 696 S.W.2d 702, 704 (Tex. App.—Fort Worth 1985, no writ). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But no abuse of discretion occurs when the trial court decides based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

## II. Application

The only factual basis on which the Hamiltons argue lack of good cause is the fact that they have adopted Jacob's siblings. They assert that federal and state law and Department policy all prioritize placing a child with the child's siblings when possible. Under the circumstances of this case, their evidence was insufficient to show a lack of good cause.

The federal law on which the Hamiltons rely is part of the Adoption Assistance and Child Welfare Act, 42 U.S.C.A. §§ 670–679c, which "provid[es] for the appropriation of money to be paid by the federal government to the states for certain children who are placed outside their homes, in foster homes or elsewhere." *In re T.A.W.*, 234 S.W.3d 704, 708 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (Frost, J., concurring) (citing 42 U.S.C.A. § 670). That Act was amended in 2008 by the Fostering Connections to Success and Increasing Adoptions Act. Pub. L. No. 110–351, 122 Stat 3949 (2008). As amended, one section of the Act provides that for a state to be eligible for payments, the state must have a plan that "provides that reasonable efforts shall be made" to place siblings in the same placement unless the state "documents that such a joint placement would be contrary to the safety or well-being of any of the siblings." 42 U.S.C.A. § 671(a)(31). For siblings who are not placed together, the plan must "provide for frequent visitation or other ongoing interaction between the siblings" unless the state "documents that frequent visitation or other ongoing interaction would be contrary to the safety or well-being of any of

16

the siblings."[7] However, the statute does not compel states to place siblings together, *see id.*, and "[s]tates receive funding if they comply on a systemwide basis—even if not in some individual case." *Families A Through V v. DeSantis*, 658 F.Supp.3d 1063, 1071 (N.D. Fla. 2023, order).

Like federal law, Texas law prioritizes placing siblings together. Texas Family Code Section 262.114(d) provides that when deciding on a placement for a child, the Department "shall give preference to persons in the following order: (1) a person related to the child by blood, marriage, or adoption; (2) a person with whom the child has a long-standing and significant relationship; (3) a foster home; and (4) a general residential operation." Tex. Fam. Code Ann. § 262.114(d).

Further, the Department's policy handbook states that a family who has adopted a child's siblings must be considered for placement of the child and given preference. *See* Tex. Dep't of Fam. & Protective Servs., *Child Protective Services Handbook*, § 4114.14, https://www.dfps.texas.gov/handbooks/CPS/Files/CPS _pg_4000.asp#CPS_4114_14; *see also* Tex. Fam. Code Ann. § 264.751 (defining the terms "relative," "relative caregiver," and "designated caregiver"). The Hamiltons also cite the Department's foster child "Bill of Rights," which informs foster children that

---

[7]The Hamiltons do not raise any complaints about the frequency or lack of interaction between the children. *See, e.g.*, Tex. Dep't of Fam. & Protective Servs., *Child Protective Services Handbook*, § 4114.2, https:// www.dfps. texas. gov/ handbooks/CPS/Files/CPS_pg_4000.asp#CPS_4114_2; *cf.* Tex. Fam. Code Ann. § 153.551 (providing that the sibling of a child who is separated from the child because of the Department's action may file suit requesting access to the child).

they have the right to live with their siblings in foster care, if possible, and if they are not living with their siblings, to know why. *See* Tex. Dep't of Fam. & Protective Servs., No. 2530, *Rights of Children and Youth in Foster Care*, https://www.dfps.texas.gov /Child_Protection/Foster_Care/Childrens_Rights.asp; *see also* Tex. Fam. Code Ann. § 263.008(b)(6) (providing that it is the state's policy that a child in foster care be informed of the child's rights relating to placement with the child's siblings and contact with the child's family members). "If there are no safety or other compelling reasons why [a foster child] cannot live with [his or her] siblings, it is [the] caseworker's job to try and find a home where [the child] can live with [his or her] siblings." *Rights of Children and Youth in Foster Care*, https://www.dfps.texas.gov/ Child_Protection/Foster_Care/Childrens_Rights.asp. The Hamiltons argue that based on the above provisions, "[t]he clear legislative intent and public policy reflected in these documents is that keeping siblings together in termination-adoption proceedings is in their best interest absent extreme circumstances otherwise."

The Hamiltons are correct that federal and state law, as well as Department guidance, reflect a policy that the Department should make efforts to keep siblings together when possible. However, while federal legislation encourages—and Department policy requires—the Department to make reasonable efforts to place siblings together, none of the laws or policies they cite requires keeping siblings together in all circumstances. *Cf. In re Row*, No. 319389, 2014 WL 2881148, at *7 (Mich. Ct. App. June 24, 2014) (per curiam) (unpublished) (noting that 42 U.S.C.A.

18

§ 671(a)(31) does not require a state to place siblings together under all possible circumstances). Likewise, Texas Family Code Section 262.114(d) requires giving placement preference to persons related to the child by blood or adoption, but it does not mandate placement of a child with the child's siblings, and it does not mandate moving a child from the only home the child has known if the child's siblings' adoptive or foster parents decide at some point that they want the child. Further, in making placement decisions, the Department should consider other relevant circumstances in addition to sibling placement.[8] *See* Tex. Dep't of Fam. & Protective Servs., *Child Protective Services Handbook*, §§ 4113–14, https://www.dfps.texas.gov/handbooks/CPS/Files/CPS_pg_4000.asp#CPS_4113 (listing information that the caseworker must consider before making a placement, including the biological parents' recommendations and the substitute caregiver's circumstances).

Here, although the Hamiltons point to Lilly's testimony that the Department did not offer Jacob's placement to the Hamiltons, Lilly admitted that out of concern for the siblings, she and her husband did not want to take Jacob when he was first taken into the Department's care. Even after they adopted Jacob's siblings, the

---

[8]The Hamiltons do not discuss in their brief the fact that the Department considers the Kents to be fictive kin, which would make the Kents a preferred placement option. *See, e.g.*, Tex. Dep't of Fam. & Protective Servs, *Placement Process Resource Guide* 18 (Mar. 2023), https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/Placement_Process_Resource_Guide.pdf (stating that "[t]he general order of preference for placement with relatives and other connections" is first non-custodial parents, then "[r]elatives and fictive kin" and "[o]ther connections" such as "families who have adopted the child's siblings").

Hamiltons did not ask the Department to place Jacob with them. Although Lilly testified that she had contacted a caseworker about arranging a visit with Jacob, there is nothing in the record to show that she informed the Department that she and her husband wanted to and were ready to take him until he was over five months old. Further, Ross testified that the Kents, as fictive kin and the family that Mother requested for placement, were also a prioritized placement for Jacob.

The Hamiltons argue that they understood that the Kents would be a bridge placement, and from Lily's testimony, the Hamiltons appeared to believe that they and the Kents could decide among themselves who would have custody of Jacob. However, neither the Hamiltons nor the Kents were managing conservators of Jacob with the authority to decide where Jacob would live. *See* Tex. Fam. Code Ann. § 153.371 (listing the rights of the Department when appointed as a child's managing conservator, including the right to designate the child's primary residence). There is nothing in the record to indicate that the Department had agreed to uproot Jacob and move him to the Hamiltons at any point that the Hamiltons decided they wanted him. Lilly testified that based on a conversation with one of the previous caseworkers, she believed that the caseworker understood that the Hamiltons would eventually be given placement of Jacob, but there was no evidence of what the caseworker told Lilly, and Lilly's testimony was not evidence that the caseworker had agreed to that plan or had the authority to authorize it. Further, the dispute in this case is not over whether the Department was fair to the Hamiltons in making its placement decision.

The issue is whether the Hamiltons proved that the Department had no good cause to refuse consent for their adoption of Jacob. Although the testimony about the Department's placement decision and the Hamiltons' interest in Jacob was relevant to a consideration of whether the Hamiltons would be enthusiastic parents to Jacob going forward, the testimony does not prove that the Department did not believe in good faith that Jacob would be better off staying in his current home.

The Hamiltons introduced evidence that they are good parents to the siblings and that, consequently, Jacob could potentially do well in their care despite the adverse effect that moving him would have, but they introduced no evidence that he is not already doing well in his current home. They did not produce evidence that the Kents have not been good caregivers to Jacob or that Jacob has some special needs that the Kents are unable to meet. The Kents' home was the only home that Jacob has ever known,[9] he is doing well in their care, and the Hamiltons' expert acknowledged that if Jacob has formed secure attachments to the Kents, he would be "absolutely devastate[d]" by being moved from their care. Ross testified that Jacob is "very bonded" to the Kents and is doing well in their home. On this record, even if

---

[9]We do not hold that the Department always has good cause to deny adoption of a young child by prospective adoptive parents when the child has been in someone else's care for most of the child's life. We merely recognize that a child's attachment to their current placement and maintaining a stable placement are matters that the Department may consider, among others, in deciding whether to grant consent. *See, e.g.*, *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (considering the stability of the home in evaluating the child's best interest). Here, the only basis on which the Hamiltons argue a lack of good cause is their having custody of Jacob's siblings.

the Department should have but did not offer the Hamiltons placement of Jacob, and even if they would have accepted placement if offered, their having adopted the siblings is not enough to show as a matter of law that the Department had no good-faith reason to believe that refusing consent was in Jacob's best interest. *See In re B.L.R.*, 592 S.W.3d 453, 466 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (holding that trial court did not abuse its discretion in denying the appellants' adoption petition because some evidence supported a finding that it was not unreasonable for the Department to withhold its consent); *Chapman*, 561 S.W.2d at 267 (noting that managing conservator has good cause to not consent when it has good-faith belief that child's best interest requires withholding consent).

The Hamiltons reference *M.J.P.* as a case in which a trial court granted a waiver of consent, and they state that "[i]n that case, the Department had failed to conduct a home study that had been promised, and [it] had made decisions about placement before the home studies had even been done." However, that case involved a married couple, and the child had lived with the couple for eighteen months and had bonded with them. No. 04-16-00124-CV, 2016 WL 7234041, at *1, *3, *10 (Tex. App.—San Antonio Dec. 14, 2016, no pet.) (mem. op.). The child's permanency plan was for the couple to adopt the child, but before the adoption took place, the husband filed for divorce. *Id.* at *1. The Department granted consent for the husband to adopt and denied consent to the wife. *Id.* After a trial, the trial court waived the consent requirement and granted the wife's adoption petition, based on the child having

bonded with the wife and other considerations. *Id.* Here, Jacob has only lived with the Kents. Further, Lily testified that the Department had conducted a home study, and there was evidence from which the trial court could find that the Hamiltons did not want to take Jacob when he came into care.

Finally, the Hamiltons argue that allowing them to adopt Jacob was in his best interest. *See Chapman*, 561 S.W.2d at 267 (requiring finding that waiver of consent is in child's best interest before waiver may be granted); *see also* Tex. Fam. Code Ann. § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."). Again, however, they rely only on the fact that they adopted the siblings. They cite Texas Family Code Section 263.307(b)(13), which states that "in determining whether the child's parents are willing and able to provide the child with a safe environment," the trial court should consider the factors listed in that section, including "whether an adequate social support system consisting of an extended family and friends is available to the child." Tex. Fam. Code Ann. § 263.307(b)(13). They argue that "[s]eparating siblings is contrary to this factor because siblings . . . are one of the closest social support systems [that] people have" and that not placing Jacob with his siblings "has the effect of separating the siblings from their closest familial social support system."

The Hamiltons do not address any of the other best-interest factors in that section and do not address other ways—such as visitation and other interactions—

23

that siblings and other relatives can provide a social support system to a child. Additionally, they presented no evidence that Jacob does not currently have a good social support system. Further, we point out that Section 263.307 states that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." *Id.* § 263.307(a).

We agree with the Hamiltons that, in line with the statutes and policies they have cited, the Department should, as a general rule, attempt to place siblings together. However, under the circumstances of this case, we cannot say that the Hamiltons proved as a matter of law that the Department's denial of consent is contrary to Jacob's best interest.

On this record, the Hamiltons did not establish as a matter of law a lack of good cause, and the trial court had some evidence on which to deny their motion to vacate. Because the Hamiltons failed to meet their burden, we cannot say that the trial court erred or abused its discretion by granting the motion for judgment, signing the Order, and denying the Hamiltons' motion to vacate.[10] We therefore overrule the Hamiltons' issues.

---

[10]In the Hamiltons' motion to vacate, they argued among other things that because the Kents were licensed as a foster family, they could not qualify as either a "designated caregiver" or a "relative caregiver" under Family Code Section 264.751 so as to "supersede the federal and state requirements that the Department make good faith efforts to place the child with family and to keep siblings together." They further argued that the trial court erred by excluding Dr. McKenzie's export report, which opined on the interactions that he had observed between the Hamiltons and Jacob and which the trial court had excluded on the basis that it had not been timely

24

## Conclusion

Having overruled the Hamiltons' issues, we affirm the trial court's order.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  January 11, 2024

---

provided to the Department. The Hamiltons do not make these arguments on appeal, and we therefore do not address them. Even if we considered the arguments, however, our disposition would not change because we do not base our holding on whether the Hamiltons are good parents—the Department did not dispute the Hamiltons' parenting abilities, and the trial court admitted Dr. McKenzie's testimony on that point—and the fact that the Kents had had a foster license at some point did not necessarily prevent them from being considered fictive relatives. *See, e.g.*, *In re D.S.*, No. 02-15-00350-CV, 2016 WL 1267808, at *5 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op.); *In re E.N.Q.*, No. 04-17-00089-CV, 2017 WL 2791286, at *2 (Tex. App.—San Antonio June 28, 2017, pet. denied) (mem. op.); *In re A.A.*, No. 01-13-00542-CV, 2013 WL 6569922, at *4 (Tex. App.—Houston [1st Dist.] Dec. 12, 2013, pet. denied) (mem. op.). Further, as we have said, whether the Hamiltons should have had priority for Jacob's placement is not determinative of the good-cause issue. Thus, these grounds did not demonstrate that the trial court abused its discretion by denying their motion.